IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Dawn M. Chappel, | : | Case No. 1:22-cv-747 |
| | : | |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | |
| Adams County Children's Services, *et al.*, | : | Order |
| | : | |
| | : | |
| Defendants. | : | |

This matter is before the Court on dispositive motions filed by all the Defendants in this action.  Specifically, the following motions are pending and ripe for ruling: Defendant Ashlee Moore's Motion for Judgment on the Pleadings (Doc. 85) and Motion for Summary Judgment (Doc. 102); Defendant Sharon Anderson/Adams Metropolitan Housing Authority's ("AMHA") Motion to Dismiss[1] (Doc. 100) and Motion for Summary Judgment (Doc. 101); and Defendant Donnie Edgington's Motion for Summary Judgment (Doc. 103).[2]

For the reasons that follow, Moore's Motion for Judgment on the Pleadings (Doc. 85) will be **DENIED,** and her Motion for Summary Judgment (Doc. 102) will be **GRANTED PART AND DENIED IN PART**.  Anderson's Motion to Dismiss (Doc. 100) will be **DENIED,** but her Motion for Summary Judgment (Doc. 101) will be **GRANTED**.  Edgington's Motion for Summary Judgment (Doc. 103) will be **GRANTED.   Finally, Plaintiff is put on notice that she must obtain leave of Court before filing any additional filings in this case and failure to**

---

[1] The Court will refer to this as Anderson's Motion.

[2] On March 25, 2026, Chappel also attempted to file 19 pages of "supplemental" arguments and citations to demonstrate questions of fact exist.  (Doc. 137, 137-1, 137-2, 137-3, 137-4.)  This filing is significantly out of time and will not be considered.  Chappel was warned on multiple occasions that her filings must comport with the Undersigned's Standing Order and the Local Rules.   This case has been incredibly burdensome on the Court with respect to the number of filings that do not comply with the aforementioned rules.  Allowing late consideration of a new brief after the matter was fully ripe would unnecessarily further protract this already extensive litigation.   As such, the Court did not consider the filing.  Plaintiff's Motion (Doc. 137) is **DENIED**.

**follow the Undersigned's Standing Order and the Southern District of Ohio Local Rules will result in sanctions and pleadings being stricken.**

## I.      BACKGROUND

### A.      Procedural Background

This case has a complex procedural history, but the facts themselves involve a fairly narrow window of time in November 2022 during which Plaintiff Dawn Chappel allegedly consented under duress to her children temporarily being removed from her custody until a custody hearing was held, at which time she lost custody due to a failed drug test.  Plaintiff alleges constitutional violations against the caseworker, Defendant Moore, who was involved in her custody case.  Chappel asserts that her home was searched without a warrant and her custody rights taken through a safety plan implemented by coercing her consent.  Chappel was subsequently evicted from her home.  She asserts Fair Housing Act ("FHA") retaliation against Defendants Sharon Anderson, who is employed by AMHA, and Donnie Edgington, the Chief of Police in Winchester, Ohio.

After these events unfolded, Chappel initiated this federal lawsuit on December 14, 2022 against Adams County Children Services ("ACCS") and Ashlee Moore, a caseworker for ACCS, alleging her constitutional rights were violated in relation to child custody proceedings in Ohio. (Doc. 1.)  Because Plaintiff was granted leave to proceed *in forma pauperis*, the Magistrate Judge conducted a *sua sponte* review of Chappel's lengthy and at times difficult to follow Complaint to determine whether it or any portion should be dismissed as frivolous, malicious, or for failure to state a claim upon which relief may be granted or for seeking monetary relief from a defendant who is immune from suit.  *See* 28 U.S.C. § 1915(e)(2)(B).  On December 29, 2022, the Magistrate Judge issued a Report and Recommendation recommending that the Complaint be

2

dismissed with prejudice. (Doc. 7.) Chappel objected and then sought to amend her Complaint. (Docs. 9, 10.) The Magistrate Judge then issued a Supplemental Report and Recommendation in which she recommended that Plaintiff's Motion for Leave to Amend be denied. (Doc. 11.) The Court issued an Order adopting the Magistrate Judge's Reports and Recommendations, with modification.[3] (Doc. 18.)

Plaintiff appealed the dismissal. On October 23, 2024, the Sixth Circuit Court of Appeals issued an Order vacating the Court's Order in part and affirming the Order in part. *Chappel v. Adams Cnty. Children's Servs.*, No. 23-3526 (6th Cir. October 23, 2024) (Doc. 21). The Sixth Circuit remanded Plaintiff's proposed retaliation claim based upon her exercise of rights under the FHA for consideration of the claim in the first instance.

Upon the case's remand, the Court issued an Order granting leave to amend the Complaint and summarizing the claims in this action as follows:

(1) Fourteenth Amendment substantive due process claim against Defendant Ashlee Moore based on the deprivation of Plaintiff's parental rights between November 14 and November 23, 2022.
(2) Fourteenth Amendment procedural due process claim against Defendant Moore based on the November 14, 2022 removal of Plaintiff's children from her home.
(3) Fourth Amendment claim against Defendant Moore based on the November 14, 2022 search of Plaintiff's home, seizure of her children, and drug testing.
(4) Retaliation based on the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.* and its corresponding regulation against Defendants Moore, Donnie Edgington (Chief of the Winchester Police Department), and Sharon Anderson (with Adams County Housing Authority). *See* 42 U.S.C. § 3617; 24 C.F.R. § 100.400(c)(5).

(Doc. 42 at PageID 930.) No claims remained against ACCS or Sonya Meyer (Supervisor of

---

[3] The Undersigned included only one modification. The Magistrate Judge determined that Plaintiff's Amended Complaint resolved the *Rooker-Feldman* issue present in Plaintiff's original complaint. The Undersigned found that the *Rooker-Feldman* doctrine continued to bar Counts 1, 2, and 3 of Plaintiff's Proposed Amended Complaint. (*See* Doc. 18 at PageID 522–23).

ACCS), who was proposed as a defendant in Plaintiff's Amended Complaint.[4]  (*Id*. at PageID 929–30.)

On September 9, 2025, Moore filed a Motion for Judgment on the Pleadings, the primary basis for which she asserts is that she has never been served.[5]  (Doc. 85.)  Chappel responded in opposition.[6]  (Doc. 104.)  Moore filed a reply on November 7, 2025.  (Doc. 114.)  On October 14, 2025, Moore filed a Motion for Summary Judgment in the event that the Court finds jurisdiction over her is appropriate.  (Doc. 102.)  Plaintiff responded in opposition on December 3, 2025 (Doc. 131), and Moore replied on December 16, 2025.  (Doc. 132.)

Anderson filed a Motion to Dismiss on October 10, 2025 (Doc. 100) and a Motion for Summary Judgment on October 14, 2025.  (Doc. 101.)  Chappel filed a response in opposition on December 3, 2025 (Doc. 129), and Anderson filed a Reply to the Motion to Dismiss, but not the Motion for Summary Judgment, on December 16, 2025.  (Doc. 133.)

Edgington filed a Motion for Summary Judgment on October 16, 2025.  (Doc. 103.)  Chappel responded in opposition on December 3, 2025 (Doc. 130), and Edgington filed a reply on December 16, 2025.  (Doc. 134.)

---

[4] On May 8, 2025, the Court issued an Order adopting the Magistrate Judge's February 5, 2025 Order and Report and Recommendation and February 26, 2025 Order and Report and Recommendation.  (Doc. 71.)  The Court denied Chappel's motions for preliminary injunctions because the relief requested with respect to the alleged violations of her Fourth and Fourteenth Amendment rights were prospective, forward-looking relief that would not remedy the alleged past injuries, and she could not demonstrate a likelihood of success on the merits of her FHA retaliation claim.  (*Id*.)  Chappel filed an interlocutory appeal, and on January 28, 2026, the Court of Appeals for the Sixth Circuit denied the appeal and affirmed the district court's ruling.  *Chappel v. Adams County Children's Servs*., No. 25-3384 (6th Cir. Jan. 28, 2026) (Doc. 135).

[5] The Court notes, as reflected in its docket entries and a formal Order (Doc. 113), many filings did not comply with the Southern District of Ohio Local Rules and Federal Rules of Civil Procedure.  As such, the docket is cumbersome and difficult to navigate with many entries necessitating refiling.  The Court strives to cite to the most recent and appropriate filings where there are duplicates in the record.  Due to a series of filing issues by Plaintiff, the briefing was incredibly protracted.

[6] The Court granted Plaintiff leave to file a late response.  (Doc. 113.)  However, Plaintiff did not file the proposed response separately on the docket, which was filed as part of her Motion for Leave.  (Doc. 104.)  Thus, the Court cites to Document 104, which includes Plaintiff's proposed Memorandum in Opposition.  (*See id.* at PageID 2875–2878.)

4

**B.**      **Facts of the Case**

Chappel alleges that Moore violated her Fourth and Fourteenth Amendment rights by unlawfully searching her home, forcing her to take a drug test and coercing her to sign a safety plan temporarily removing her children from her custody.   She also alleges that Moore, Anderson, and Edgington interfered with her rights under the FHA by retaliating against her for opposing disability discrimination as a recovering drug addict.

The discovery in this case is very limited at the summary judgment stage.  Only Chappel has been deposed.  (Doc. 87.)  Otherwise, the evidence upon which the parties rely are Court filings, documents produced in discovery, and the Declaration of Moore.  (Doc. 99-1.)  Plaintiff relies upon scattered documents filed throughout the record[7] and repeatedly attempts to file extra documents, which will not be considered.[8]  The documents identified by Chappel are, at times, a string of citations without explanation about their relevance to this case.  If they are referenced, Chappel often fails to provide explanation or citation to the information in the filed exhibits, apparently expecting opposing counsel and the Court to examine and piece together multiple entries to determine how and to what extent they may support her claims.  At the onset, the Court notes that, " 'judges are not like pigs, hunting for truffles' that might be buried in the record." *Emerson v. Novartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).  The Court has devoted an inordinate

---

[7] Chappel attached over 350 pages of documents to her Memorandum in Opposition to Moore's Motion for Summary Judgment.  (*See* Docs. 115, 115-1–50.)  She did not cite any of these documents in her Response in Opposition to Moore's Motion for Summary Judgment.  (*See* Doc. 131.)  While she broadly cites documents in her Response to Moore's Statement of Undisputed Facts and Proposed Disputed Issues of Material Fact, she mainly includes argument and does not specifically identify quotes or explain how the documents support her arguments so as to indicate the evidentiary value of her citations.

[8] For instance, one of the documents she cites is a filing labeled "Notice of Filing" which is an 8-page, single-spaced chart she labels a "timeline" of purported events which includes citations and argument.  Chappel also attempted to file and rely upon this as her own sworn statement.  This document was not an authorized filing, nor is it evidence, and it will, therefore, be **STRICKEN** from the record.  (Doc. 117.)

amount of time to this case.  It is unable to sift through countless documents hunting for the key evidence in support of Plaintiff's case that she has not specifically identified.

The facts are summarized below.

### 1.    Ashlee Moore's Declaration

According to Moore's Declaration, Moore was assigned as a caseworker to Chappel's case from October to December of 2022.  (Doc. 99-1 at PageID 2640.)  However, Moore knew Chappel from prior interactions within ACCS and knew about her history of substance abuse prior to serving as her caseworker.  (*Id.*)

On October 12, 2022, ACCS received a report that a woman named April Cortijo had given birth to a baby in a driveway but did not take the child to the hospital.  (*Id.*; Intake Report, Doc. 99-2.)  Cortijo had an open case with ACCS at the time, and Moore was aware that she had a history of substance abuse.  (Doc. 99-1 at PageID 2641.)  ACCS had been attempting to locate Cortijo since July 2022 but had been unable to do so.  (*Id.*)  In response to the October 12, 2022 call that Cortijo was present at Chappel's home, agency caseworkers Emily Grooms and Kelsey Redmon went to Chappel's home to investigate.  (*Id.*)  Grooms and Redmon made contact with Chappel's significant other, Eric McKinzie, Sr.  (*Id.*)  McKinzie went inside to retrieve Cortijo, who came outside to speak with Grooms and Redmon.  (*Id.*)  Cortijo appeared to have just given birth and had scabs on both arms.  (*Id.*)  When asked about her newborn, Cortijo eventually went inside Chappel's home to retrieve the newborn, who was in poor health and had to be rushed to the hospital.  (*Id.*)  Grooms and Redmon observed Chappel's home from the driveway to be dirty and unkept.  (*Id.*) They asked permission to go inside to investigate but were denied.  (*Id.*) Grooms completed an intake report regarding the encounter, which Moore reviewed as Chappel's caseworker.  (*Id.* at PageID 2642.)

On October 17, 2022, Moore attempted to make an unannounced visit to Chappel's home. (*Id.*)  She knocked on the door, but no one answered; however, she heard speaking in the driveway and discovered it was Cortijo. (*Id.*)  Cortijo had visible scabs on both of her arms and appeared pale. (*Id.*)  Cortijo informed Moore that Chappel was not home. (*Id.*)  Chappel's daughter, T.C., came outside. (*Id.*)  Cortijo yelled at T.C., "they aren't back yet." (*Id.*)  T.C. informed Moore that her mother was not home. (*Id.*)  Moore asked Cortijo to have Chappel contact her, and Cortijo advised that she would do so. (*Id.*)

On October 18, 2022, ACCS caseworker Kelsy Shoenfelt attempted to make an unannounced visit to Chappel's home on Moore's behalf. (*Id.*)  Although she heard noise from within the home, she was unable to make contact with anyone. (*Id.*)  ACCS attempted another unannounced visit on Octboer 20, 2022, but received no response. (*Id.*)

Moore requested the Adams County Prosecutor's Office send a letter of non-compliance to Chappel at her home address. (*Id.*)  Based on the October 12, 2022 report, observations, and repeated attempts to make contact with Chappel, Moore filed two complaints on behalf of ACCS with the Adams County Juvenile Court on November 8, 2022 concerning Chappel's children, E.M. and T.C.  (*Id.* at PageID 2643.)

On November 8, 2022, Magistrate Judge David M. Hunter of the Court of Common Pleas, Juvenile Division, of Adams County, Ohio issued a Magistrate's Order stating as follows:

> [T]he Court finds that the facts alleged in the complaint require the Court to issue the following temporary order in the child's interest and welfare.  The agency has attempted on multiple occasions to investigate reports regarding the minor child(ren) set forth in the caption above.  The facts imply that the lack of contact may be a result of a parent avoiding contact.  The concerns surround the safety and suitability of the care being provided for the children.  The agency is hereby granted protective supervision of the minor children pending further proceedings.
>
> IT IS THEREFORE ORDERED that Dawn CHAPPEL AND/OR Eric MCKINZIE any other adult residing at 211 Sunshine Avenue Winchester, OH

7

45697 are ordered to produce the children at the request of the agency caseworker and/or allow the worker access to the residence so that the worker may investigate the allegations in the case.  Specifically, the parties listed above shall permit the worker to access the residence where the child(ren) are located to ensure their safety.  Law Enforcement may assist the worker upon request.

IT IS SO ORDERED

(Doc. 99-4 at PageID 2670.[9])  The complaint referenced is an affidavit signed by Moore before

the Judge and Deputy Clerk on November 8, 2022, attesting as follows:

> **ALLEGED DEPENDENT CHILD**
> The undersigned, being duly sworn and cautioned according to law, says that she has knowledge of a certain child, to-wit: E M (DOB: 13), age 9 YEARS, who appears to be a Dependent child in that:
> <u>**COUNT ONE: DEPENDENT**</u>
> said child whose condition or environment is such as to warrant the State, in the interests of the child, in assuming the child's guardianship; thus making said child Dependent as defined by Ohio revised Code § 2151.04(C).
>      **To wit**: On October 12, 2022 the Agency received a report that an individual was residing at the residence of Dawn Chappel, the individual was identified as April Cortijo, who was found hiding in the home and lied to CPS about her child's birth until the baby was eventually removed from the residence and transported for medical treatment.  While at the residence the Agency observed the home from the doorway and observed it to be very dirty and known drug users were living in their home.  Dawn Chappel would not allow the Agency into the residence.  The Agency made another visit to the family on October 17, 2022 and April Cortijo was in the driveway and stated that the family was not home.  The Agency proceeded to knock on the door and the child's sibling answered and stated that Dawn Chappel was her mother  The home visit was not successful.  On October 28, 2022[10] the Agency attempted another home visit with no success.  A non-compliance letter was sent to the mother on October 20, 2022 with no response.  The Agency has concerns for the safety of the child(ren) due to the home being filthy, drug use occurring in the home and the non-compliance of the family.
> Complainant further states:
>      That the names and addresses of the parents/guardian/custodian of said child are as follows:

---

[9] "A juvenile court order is appropriate for judicial notice" and "plainly meets the requirements of [Federal] Rule [of Evidence] 201." *Hancock v. Miller*, 852 F. App'x 914, 919–920 (6th Cir. 2021).  "Judicial records are a source of 'reasonably indisputable accuracy' when they record some judicial action such as dismissing an action, granting a motion, or finding a fact." *Id*. at 919 (quoting *United States v. Ferguson*, 681 F.3d 826, 834 (6th Cir. 2012)).  Under this clear authority, the Court takes judicial notice of the Magistrate's Order (filed at Doc. 99-4) and the Complaint which was attached to and incorporated into the Magistrate's Order (filed at Doc. 105-22).

[10] These dates are different than those provided in Moore's Declaration.  It is unclear if the dates were transposed inadvertently or the complaint is referencing different visits.

8

**Mother, Dawn Chappel, 211 Sunshine Avenue, Winchester, OH 45697**
**Alleged Father, Eric McKinzie, 211 Sunshine Avenue, Winchester, OH 45697**
WHEREFORE, Adams County Children Services respectfully requests this
honorable Court <u>grant PROTECTIVE SUPEVISION of the above-named child to</u>
<u>Adams County Children</u> Services, or in the alternative, make a finding and
appropriate disposition pursuant to Ohio Revised Code § 2151.353 or
2151.33(B)(1).  The Agency further requests an **ORDER** to allow the Agency to
enter the home to conduct a safety review.
*The State of Ohio and the Agency further requests an ORDER TO COMPLY*
*directed to the parents to allow the Agency to enter the home to conduct a safety*
*review and to further investigate this matter.*

(Doc. 105-22 at PageID 3086–87.)

On November 14, 2022, Moore went to 211 Sunshine Avenue to access Chappel's home

pursuant to the November 8, 2022 Magistrate's Order.  (Doc. 99-1 at PageID 2643.)  Moore

requested the help of law enforcement and Winchester Police, and Chief Donnie Edgington

responded along with the maintenance man to Chappel's property.  (*Id*.)

Moore knocked on the door and could hear movement inside the home.  (*Id*.)  McKenzie

answered the door, and Moore showed him a copy of the Order and explained that they needed to

come inside.  (*Id*.)  McKenzie took the Order and went to speak with Chappel.  (*Id*.)

Chappel came to the door, and Moore explained to her that pursuant to the Court Order,

they needed to come inside.  (*Id*. at PageID 1644.)  Moore asked Chappel if they could come

inside.  (*Id*.)  Chappel stated that the house was messy but agreed to let them inside.  (*Id*.)  Moore

"observed Ms. Chappel's home to be in complete disarray."  (*Id*.)  The house was "dirty and

cluttered" and "[t]here were about ten cats in the home with cat litter all over the floor."  (*Id*.)

One of the cats had two broken legs and "was bleeding all over the floor."  (*Id*.)  The trash was

overflowing in the living room.  (*Id*.)  Moore took photographs of her observations.  (*Id*.; *see*

Doc. 99-3.)

9

Moore went over "the report"[11] with Chappel and she "asked her if she would be willing to take a urine drug test." (*Id.*) "Chappel refused the urine drug test, but agreed to take an instant mouth swab." (*Id.*) Moore contacted Denise Sowards of ACCS to attempt an instant mouth swab drug screening of Chappel. (*Id.*) Sowards arrived and  attempted to perform the swab, but Chappel could not provide enough saliva for the test to work. (*Id.*)

At this time, the maintenance man discovered Cortijo and a man named Buck Richards were hiding in the back room of Chappel's home. (*Id.*) Moore informed Chappel that Cortijo and Richards should not be at her home. (*Id.*) Chappel told Richards he was no longer allowed to stay there, and he left. (*Id.* at PageID 2645.) Chappel then contacted her attorney. (*Id.*)

Moore informed Chappel that she would like for her to find somewhere else for her children to go because of the conditions of her home and concerns that she and McKenzie were using drugs. (*Id.*) Chappel said the situation was "ridiculous" and tried to contact her attorney again. (*Id.*) Chappel contacted the children's grandmother, Shirley Rose, to have Rose pick up the children. (*Id.*) Moore went outside to begin completing a safety plan she intended to put in place for the children. (*Id.*) At that time, Edgington and the maintenance man left Chappel's home. (*Id.*)

While outside, McKenzie asked to speak with Moore, and he informed her that Rose would not be able to pick up the children until later on that day. (*Id.*) Moore contacted her supervisor, Angela Rose, and explained what was going on. (*Id.*) Supervisor Rose advised Moore that she could leave once Chappel signed the safety plan. (*Id.*) Moore contacted Chief Edgington to request that he come back to Chappel's house. (*Id.*) Once he returned, Moore went back inside Chappel's home and went over the safety plan with Chappel, which Chappel "ultimately agreed to and signed." (*Id.*) Chappel's son E.M. was also home during the visit.

---

[11] The Court does not know what "report" this is.

(*Id*.)

Moore left after Chappel signed the safety plan[12] and did not remove E.M. from her home at that time. (*Id*. at PageID 2646.) T.C. was not present. (*Id*.) Moore attended a juvenile court hearing on November 23, 2022 concerning Chappel's two children. (*Id*.) Chappel attended the hearing and was represented by counsel. (*Id*.) Both she and McKenzie failed drug screenings at the hearing. (*Id*.) That day, the Magistrate Judge issued a Magistrate's Decision and Judgment Entry on Adjudication.[13] (Doc. 99-6.) In the Decision and Judgment Entry, the Magistrate Judge stated that "[b]oth parents tested positive at the hearing today. Mother for methamphetamine and amphetamine and Father for Methamphetamine, amphetamine, and marijuana." (*Id*. at PageID 2674.) The Magistrate Judge found Chappel's two children to be dependent and set forth a plan for committing the children to the temporary custody of ACCS. (*Id*. at PageID 2675.)

After December 2022, Moore was no longer assigned as one of Chappel's case workers. (Doc. 99-1 at PageID 2646.) Moore had no involvement in Chappel's housing or her subsequent eviction. (*Id*.)

### 2. November 14, 2022 Activity Log

Chappel relies on an Activity Log seemingly drafted by Moore summarizing her visit to Chappel's home on November 14, 2022.[14] (Doc. 115-15.) It states in relevant part:

> This worker along with Chief Edgington of the Winchester Police Department
> and maintenance man Chad Long made a visit to Dawn Chappel's. [. . .] This
> worker knocked several times and no one came to the door. Chief Edgington
> knocked loudly and yelled at Dawn that he knew she was in there and to come
> out. Chief Edgington had to knock and yell several more times and Eric

---

[12] Oddly, the parties did not rely upon this document in their briefing of the issues of this case.
[13] The Court takes judicial notice of the Magistrate's Decision and Judgment Entry on Adjudication (Doc. 99-6).
*See Hancock*, 852 F. App'x at 919.
[14] Although Chappel relied upon only one page of this document, the Court considered the entirety of it as it was
otherwise incomprehensible.

McKinzie came to the door and stated he had been asleep. This worker explained the order to comply and showed it to Eric. Chief Edgington explained the order to comply and Eric stated "Are you f[--]ing kidding me? This is ridiculous" Eric grabbed the paper and went inside and shut the door. Eric stated he would be back out. This worker could hear Eric yelling inside and Dawn came to the door. This worker informed Dawn that this worker needed to come inside. Dawn stated her place was a mess but she agreed to allow this worker to come inside.

\* \* \*

This worker went over the report with Dawn and Eric but Eric would not listen and stated he was not doing anything this worker said. Dawn stated that she could not pee and did not feel comfortable taking a urine screen because the agency has given them to her before and she had false positives every time and they had to find somewhere for their children to stay because of that. Dawn agreed to only do a mouth swab. Case aide Denise Sowards came to attempt the instant month swab but Dawn was not able to provide enough saliva for the test to work. Eric was pacing and this worker attempted several times to observe his drug screen and he stated he could not go with this worker watching him.

\* \* \*

This worker informed Dawn that this worker would like her to find a place for her children to stay because of the conditions of the home and the concern this worker has that they are using. Eric stated "I f[---]ing told you Dawn. Here they go again." Dawn stated this was ridiculous and tried contacting her attorney again.

\* \* \*

Dawn contacted Shirley Rose, Eric's mother, via text and asked her to come and get the children. This worker informed Dawn this worker would complete the safety plan while waiting on Shirley to arrive. Eric and Dawn both agreed to sign the refusal for the urine drug screen. This worker went to the car and waited for Shirley to arrive. This worker filled out the safety plan while sitting in the car.

\* \* \*

This worker contacted supervisor Angela Ross[15] who stated this worker could go ahead and leave the home after getting the parents to sign the safety plan and then Shirley could come to the agency with the children. Chief Edgington arrived back so this worker could talk with the parents again. This worker tried

---

[15] Moore's Declaration refers to her supervisor as "Angela Rose" while the Activity Log refers to her as "Angela Ross."

> explaining this to Dawn but she asked this worker to come inside and this worker asked Chief Edgington to also come in.  This worker went over the safety plan.
>
> * * *
>
> This worker informed Dawn that she needed to sign the safety plan and she did so.  Eric also signed.  This worker informed Dawn that Shirley would be picking up the children and would be meeting with this worker soon.  This worker informed Dawn that most likely the agency would have a court hearing soon and this worker discussed protective supervision.

(Doc. 115-15 at PageID 3536–37) (as written).

### 3.    Plaintiff's Deposition

According to Chappel's deposition, on November 14, 2022:

> Ashlee Moore, Donnie Edgington and Chad Long all showed up at my home pounding on my door and yelling.  They said they had a court order to come into my home.  I asked why, how.  They said that I had people unfit to be around children in and out of my home.  And that's how she got the court order.

(Doc. 87 at PageID 1572.)  Chappel claims Moore "[r]emoved my children.  She misrepresented the document I was signing.  Said that I was – I had to comply with the court orders and drug testing."  (*Id*. at PageID 1573.)  Chappel testified that she signed what she was told was a "care plan" on November 14 "after four hours and being told that Moore was not going to leave until we signed the documents, we signed them."  (*Id*. at PageID 1608).

### 4.    Facts Regarding Plaintiff's Lease Termination[16]

On November 14, 2022, Plaintiff was living at 211 Sunshine Avenue, Winchester, Ohio, which is owned by AMHA.  (Eviction Complaint and Notice of Termination, Doc. 98-1 at PageID 2621–26.)  On December 1, 2022, AMHA served a Notice of Termination for the tenancy of Chappel and McKenzie at 211 Sunshine Avenue.  (*Id*.; Doc. 87 at PageID 1534–35, 1682–84.)  The Notice of Termination cited multiple lease violations including illicit drug

---

[16] The Court takes judicial notice of the underlying Court filings referenced relating to the eviction proceeding in state court.  See *Hancock*, 852 F. App'x at 919.

13

activity, occupancy violations, pet policy violations, and maintenance violations.  (Doc. 98-1 at PageID 2624–26.)

On February 1, 2024, AMHA served upon Chappel and McKenzie a 3-day Notice to Leave the Premises of 211 Sunshine Avenue.  (Doc. 87 at PageID 1543–44, 1688, 1555; Doc. 98-1 at PageID 2627.)   On July 2, 2024, AMHA filed a Complaint against Chappel and McKenzie for breach of the rental contract, including failure to comply with rules for limiting number of people staying at the residence, pets, keeping the residence in a clean, sanitary and safe manner, drug activity at the unit, and failure to report income changes.  (Doc. 98-1 at PageID 2620–22.)  The case was assigned as a Forceable Entry and Detainer Action (Eviction).  (Doc. 97-2 at PageID 2410.)  An eviction hearing was held on July 31, 2024 in Adams County Court, and both Chappel and McKenzie appeared.  (Doc. 97-4 at PageID 2413.)  The Judgment Entry by Judge Roy E. Gabbert, Jr. states that the lease terms were violated, that "[t]he parties agreed on the record to these findings and the Court order on eviction & vacate[.]"  (*Id*.)  Chappel and McKenzie were ordered to vacate the premises by Monday, August 12, 2024 at 10:30 a.m..  (*Id*.)

Chappel and McKenzie filed a Notice of Appeal of the July 31, 2024 Judgment Entry on August 7, 2024. (Doc. 97-5, 97-6.)  Judge Roy E. Gabbert, Jr. held a hearing on September 11, 2024 on damages.  (Doc. 97-7.)  Judge Gabbert issued a Judgment Enry finding that unpaid rent totaled $8,087.32, and AMHA was to receive judgment in that amount with 8% interest.  (*Id*.)

On November 1, 2024, the Fourth Appellate District Court of Appeals for the State of Ohio dismissed Chappel and McKenzie's appeal of the July 31, 2024 Judgment.  (Doc. 97-10 at PageID 2611–12.)  Chappel filed a Notice of Appeal of that decision on November 18, 2024.  (Doc. 97-11 at PageID 2613.)  The Supreme Court of Ohio declined to accept jurisdiction for the

14

appeal on February 13, 2025.  (Doc. 97-12 at PageID 2615.)

## II.  MOORE'S MOTIONS

Moore filed both a Motion for Judgment on the Pleadings (Doc. 85) and Motion for Summary Judgment (Doc. 102).   The Motion for Judgment on the Pleadings will be denied, and the Motion for Summary Judgment will be granted in part and denied in part.

### A.  Motion for Judgment on the Pleadings

### 1.  Standard of Law

Moore moves for judgment on the pleadings under Rule 12(c) on the basis that she was never served.  (Doc. 85.)  Rule 12(c) permits a party to move for judgment on the pleadings.  The legal standard for adjudicating a Rule 12(c) motion is the same as that for adjudicating a Rule 12(b)(6) motion.  *Lindsay v. Yates*, 498 F.3d 434, 437 n.5 (6th Cir. 2007).  Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).   "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment."  *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008) (citation omitted).  The district court may only consider the pleadings when ruling on a Rule 12(c) motion, but the pleadings include documents attached to an answer if it is "central to the plaintiff's claim and of undisputed authenticity."  *Beasley v. Wells Fargo Bank, N.A.*, No. 3:17-CV-00726, 2017 WL 3387046, at *3 (M.D. Tenn. Aug. 7, 2017), *aff'd sub nom.*, 744 F. App'x 906 (6th Cir. 2018).

Whether a party is properly served is a jurisdictional issue that should be raised under Rule 12(b)(2), governing dismissal motions based upon lack of personal jurisdiction, not Rule

12(c).  A district court cannot rule on the merits under Rule 12(c) if personal jurisdiction is lacking.  "In the absence of 'proper service of process, consent, waiver, or forfeiture, a court may not exercise personal jurisdiction over a named defendant.'"  *Boulger v. Woods*, 917 F.3d 471, 476 (6th Cir. 2019) (citing *King v. Taylor*, 694 F.3d 650, 655 (6th Cir. 2012)).  Despite arguing that she was never served, Moore moves under Rule 12(c)—judgment on the pleadings, a merits-based determination—rather than for dismissal due to lack of jurisdiction.  If the Court lacks personal jurisdiction over Moore as she argues, it is without authority to grant judgment on the pleadings.  Although moving under the incorrect rule would be ground enough to deny Moore's Motion, it also fails on the merits as a Rule 12(b)(2) motion.  As discussed below, Moore waived her defense that the Court lacks personal jurisdiction over her on the basis of lack of service.

  **2.**  **Analysis**

  Plaintiff filed this action on December 14, 2022.  Plaintiff attempted to send or attempted to have the U.S. Marshal send the Complaint and Summons to "Adams County Child Services Ashlee Moore" via certified mail to the address of 300 North Wilson Drive West Union, Ohio 45693.  (Doc. 1-2 at PageID 100.)  The Process Receipt and Return was not completed by the U.S. Marshal, as there has been no certification that service was completed on Ashlee Moore, and no return of service is filed on the docket.

  Upon remand by the Sixth Circuit Court of Appeals, Moore obtained counsel, who filed Notices of Appearance on October 25, 2025.  (Docs. 22, 23.)  Moore filed an Answer on November 5, 2024, in which she asserted her defense of insufficient service.  (Doc. 24.)  Through counsel, she participated in a Preliminary Pretrial Conference conducted by the Magistrate Judge on December 11, 2024 and submitted a Rule 26(f) Report in advance.  (Docs. 27, Dec. 11, 2024 Docket Entry.)  In the Rule 26(f) Report, Moore, through her attorney, marked

"No" in response to the question of whether there were contested issues related to venue or jurisdiction. (Doc. 27 at PageID 716.) The Rule 26(f) Report was signed electronically by Moore's attorney, Meyer's attorney, and Plaintiff. (*Id*. at PageID 720.) On November 27, 2024, Moore filed a Motion to Strike Plaintiff's "response" to her Answer. (Doc. 29.) The Court issued a calendar order on December 11, 2024 setting dates in this case based upon both the Rule 26(f) Report and the parties' participation in the Preliminary Pretrial Conference. (Docs. 39, 40.)

Thereafter, Moore filed an Answer to Plaintiff's Amended Complaint (Doc. 46) as well as responses in opposition to Plaintiff's requests for preliminary injunction, protective order, and forensic analysis of documents. (Docs. 47, 48, 49.) She also moved for a protective order and responded in opposition to Chappel's other pending motions. (Docs. 50, 82, 84.) Moore's attorney continued to participate in Court proceedings. (*See* March 19, 2025, April 15, 2025, July 29, 2025, August 12, 2025 Docket Entries.) Moore's attorney also attended Plaintiff's deposition and conducted cross-examination. (Doc. 87 at PageID 1566.) Shortly after filing her Motion for Judgment on the Pleadings, Moore filed a Motion for Summary Judgment in the alternative. (Doc. 102.)

Pursuant to Federal Rule of Civil Procedure 4(m), a plaintiff has 90 days after the complaint is filed to serve the defendant:

> If a defendant is not served within 90 days after the complaint is filed, the court--
> on motion or on its own after notice to the plaintiff--must dismiss the action
> without prejudice against that defendant or order that service be made within a
> specified time. But if the plaintiff shows good cause for the failure, the court
> must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m). The Court must provide an extension of time to execute service where the plaintiff demonstrates good cause, but absent good cause, the court retains discretion as to whether to enlarge that timeframe. *United States v. Oakland Phys. Med. Ctr., LLC,* 44 F.4th 565,

17

568 (6th Cir. 2022) (citing *Henderson v. United States*, 517 U.S. 654, 662 (1996)).  "A delay in challenging personal jurisdiction by motion to dismiss has resulted in waiver, even where, as here, the defense was asserted in a timely answer[.]"  *Datskow v. Teledyne, Inc., Cont'l Prods. Div.,* 899 F.2d 1298, 1303 (2d Cir. 1990) (citing *Burton v. N. Dutchess Hosp.,* 106 F.R.D. 477 (S.D.N.Y.1985); *Vozeh v. Good Samaritan Hospital,* 84 F.R.D. 143 (S.D.N.Y.1979)).[17]

Even where a defendant preserves a Rule 12(b) defense in an answer, she "may forfeit the right to seek a ruling on the defense at a later juncture through [her] conduct during the litigation."  *Boulger*, 917 F.3d at 477.  "[A] defendant's appearances, filings, and actions in the district court may constitute 'legal submission to the jurisdiction of [that] court.'"  *Id*. (citing *Gerber v. Riordan*, 649 F.3d 514, 519 (6th Cir. 2011)).  Of course, "not all conduct serves as constructive consent to personal jurisdiction."  *Id*.  The district court must inquire "whether a defendant's conduct has given the plaintiff 'a reasonable expectation' that the defendant will defend the suit on the merits or whether the defendant has caused the court to 'go to some effort that would be wasted if personal jurisdiction is later found lacking.'"  *Id*. (citing *King*, 694 F.3d at 659) (cleaned up).  The determination of whether a defendant waived service is more of an "art than science" and "there is no bright line rule."  *Id*. (citing *State Auto Ins. Co. v. Thomas Landscaping & Constr*., No. 2:09-cv-735, 2011 WL 3475376, at *6 (S.D. Ohio Aug. 9, 2011), *affirmed in relevant part, reversed in part, and remanded*, No. 11-3921, 494 Fed. Appx 550 (6th Cir. Aug. 15, 2012).  Ultimately, the court should consider "all of the relevant circumstances" to determine whether waiver of service by conduct occurred.  *Id*.

Moore's conduct gave Plaintiff—and the Court—the reasonable expectation that she would defend this lawsuit on the merits.  That is because Moore's attorney represented in a

---

[17] But here, Moore moves for under Rule 12(c)—motion for judgment on the pleadings—rather than under Rule 12(b).

signed filing that Moore had no contested issues with jurisdiction or venue in this case over a year ago. (*See* Doc. 27.) Arguing now that the Court lacks jurisdiction due to lack of service is completely contrary to Moore's representations to this Court and to the other parties in his litigation.

Not only that, but Moore participated actively in this litigation as well. Through her attorney, Moore filed substantive motions and participated in court conferences and discovery. Drawing upon a similar case, in *West v. Hilton*, the district court found that defendants' failure to assert the affirmative defenses of insufficient service of process or personal jurisdiction as well as active participation in the litigation for a year prior to filing a motion amounted to waiver of those affirmative defenses. No. 3:10-cv-284, 2012 U.S. Dist. LEXIS 45880, at *3 (S.D. Ohio April 2, 2012). The same logic applies here. Moore actively participated in the litigation for over a year, failed to raise her objection in a written motion, and submitted a signed Court filing stating that she had no contested issues with jurisdiction. Moore's representation to the Court and active participation in this litigation thus amounts to an equitable waiver of service. Finding otherwise would be inequitable.

Her Motion for Judgment on the Pleadings (Doc. 85) is not well-taken and is **DENIED.**

### B. Motion for Summary Judgment

Chappel alleges Moore violated her Fourth Amendment rights by searching her home, seizing her children, and drug testing her; her Fourteenth Amendment substantive due process rights by removing her children between November 14 and 23, 2022; her Fourteenth Amendment procedural due process rights by removing her children on November 14, 2022; and her FHA rights by retaliating against her. For the reasons that follow, Moore is entitled to summary judgment on all claims except for the Fourteenth Amendment due process claims.

### 1.      Standard of Law

As an initial matter, Chappel's argument that because the Sixth Circuit remanded this case, Moore's summary judgment motion is "foreclosed as a matter of law" is an incorrect statement of that law.  (Doc. 131 at PageID 4715.)  Federal Rule of Civil Procedure 56, not Rule 12, governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant has the burden to show that no genuine issues of material fact are in dispute.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585– 587 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).  The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–324 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*).  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could

return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted).

"Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at

248. "The court need consider only the cited materials, but it may consider other materials in the

record." Fed. R. Civ. P. 56(c)(3).

### 2. 42 U.S.C. § 1983 Claims

Moore's Fourth and Fourteenth Amendment claims arise under 42 U.S.C. § 1983, which

creates a cause of action to remedy constitutional violations as follows:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State . . . subjects, or causes to be
> subjected, any citizen of the United States . . . to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

42 U.S.C. § 1983. Moore asserts she is immune from suit under the doctrine of qualified

immunity as to Chappel's § 1983 claims.

The doctrine of qualified immunity provides "that government officials performing

discretionary functions generally are shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity provides immunity from suit, not simply a defense to liability. *Pearson v.

Callahan*, 555 U.S. 223, 231 (2009). "In the Sixth Circuit, when a defendant invokes qualified

immunity it becomes the plaintiff's burden to demonstrate: (1) that the defendant violated a

constitutional right and (2) that this right was clearly established at the time of the alleged

violation." *Clark v. Stone*, 998 F.3d 287, 298 (6th Cir. 2021) (citing *Pearson*).

To determine whether qualified immunity applies, courts must ask whether the

government official's conduct violated a constitutional right, and if yes, whether the specific

21

right violated was clearly established.  *Saucier v. Katz*, 533 U.S. 194, 200–201 (2001), *overruled in part by Pearson*, 555 U.S. at 236 (holding that the sequence of the two-step test is often appropriate, but not mandatory).  "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right."  *Pearson*, 555 U.S. at 232.  A defendant is entitled to qualified immunity if his conduct violated a constitutional right, but that right was not clearly established at the time of the violation.  *Saucier*, 533 U.S. at 200–01.  The inquiry into whether the constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Id.* at 201.

Courts can examine either issue first.  *Pearson*, 555 U.S. at 236.  The Court will consider each claim in turn.

### a.    Whether Moore Violated a Constitutional Right

### i.    Fourth Amendment

Chappel asserts that Moore violated her Fourth Amendment rights by searching her home, seizing her children, and coercing her into taking a drug test on November 14, 2022. Chappel failed to come forward with sufficient evidence to support the first two claims, and a question of fact exists as to the third.  The Fourth Amendment affords "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, ... but upon probable cause."  U.S. Const. amend. IV.  "The Fourth Amendment protects individuals from unreasonable searches and seizures[.]"  *Pop v. Brookfield Chrysler Dodge Jeep, Inc.,* No. 24-1201, 2025 WL 1010448, at *3 (6th Cir. Apr. 2, 2025) (citing *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016)).

22

1.      **Search of Chappel's Home**

Moore's search of Chappel's home on November 14, 2022 was done pursuant to a valid court order.  As set forth below, there is no constitutional violation with respect to the November 14, 2022 search of Chappel's home.

Pursuant to the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  The Supreme Court has recognized that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed[.]"  *United States v. United States Dist. Ct.,* 407 U.S. 297, 313 (1972).   Thus, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Andrews v. Hickman Cnty., Tenn.,* 700 F.3d 845, 854 (6th Cir. 2012) (citing *Groh v. Ramirez,* 540 U.S. 551, 559 (2004)).  It follows that a warrantless search or seizure inside a home by a law enforcement officer violates the Fourth Amendment unless an exception to the warrant requirement applies.  *Id.*  (citing *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006)).

A valid warrant under the Fourth Amendment requires three components.  *United States v. Whiteside,* 141 F.4th 734, 741 (6th Cir.), *cert. denied,* 146 S. Ct. 252 (2025).  "First, a neutral, disinterested magistrate must issue the warrant."  *Id.* (citing *Dalia v. United States*, 441 U.S. 238, 255 (1979)).  "Second, the warrant or warrant affidavit must show that there is probable cause to believe that the evidence being sought will further the apprehension or conviction for a specific offense."  *Id.* (citing *Dalia* (internal quotation marks omitted)).  "Finally, the warrant must describe with particularity what officers may search and seize."  *Id.* (citing *Dalia*).

23

"Probable cause 'is not a high bar.'"  *District of Columbia v. Wesby*, 138 S. Ct. 577, 586

(2018) (quoting *Kaley v. United States,* 134 S. Ct. 1090, 1103 (2014)).  As the Sixth Circuit

opined:

> Probable cause exists if the facts, circumstances, and "reasonably trustworthy
> information" would allow a person "of reasonable caution" to believe that a crime
> has been committed.  *Brinegar v. United States*, 338 U.S. 160, 175, 69 S. Ct.
> 1302, 93 L.Ed. 1879 (1949).  This is "a practical, nontechnical conception," *ibid.*,
> and it "requires only a probability or substantial chance of criminal activity, not
> an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243–44 n.13,
> 103 S. Ct. 2317, 76 L.Ed.2d 527 (1983).  We give "great deference" to the issuing
> magistrate's probable-cause determination.  *Id*. at 236, 103 S. Ct. 2317.

*United States v. Neuhard*, 770 F. App'x 251, 253 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 570

(2019).

Probable cause requires a "fair probability that contraband or evidence of a crime will be

found in a particular place."  *Gates*, 462 U.S. at 238.  Thus, "the affidavit supporting the search

warrant must demonstrate a nexus between the evidence sought and the place to be searched."

*United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (citing *United States v. Carpenter*,

360 F.3d 591, 594 (6th Cir. 2004) (*en banc*)).

The Sixth Circuit has held that the Fourth Amendment governs entries and searches of

homes made by social workers.  *Andrews*, 700 F.3d at 859.  Thus, "a social worker, like other

state officers, must obtain consent, have sufficient grounds to believe that exigent circumstances

exist, or qualify under another recognized exception to the warrant requirement before engaging

in warrantless entries and searches of homes."  *Id*. at 859–60.  Social workers are entitled to rely

upon information they receive from officers and are insulated from liability if the information

they rely upon is defective.  *Id*. (citing *Hardesty v. Hamburg Twp*., 461 F.3d 646, 656 (6th Cir.

2006)).

Moore argues, and the Court agrees, that the Magistrate's Order issued on November 8, 2022 meets the requirements of a valid warrant.  A neutral, detached Magistrate Judge issued the Magistrate's Order.  (Doc. 99-4 at PageID 2670.)  There is no evidence cited by either party demonstrating the Magistrate Judge was not impartial.  The Magistrate's Order states:

> The Court finds that the facts alleged in the complaint require the Court to issue the following temporary order in the child's interest and welfare.  The agency has attempted on multiple occasions to investigate reports regarding the minor child(ren) set forth in the caption above.  The facts imply that the lack of contact may be a result of a parent avoiding contact.  The concerns surround the safety and suitability of the care being provided for the children.  The agency is hereby granted protective supervision of the minor children pending further proceedings.
>
> IT IS THEREFORE ORDERED that Dawn CHAPEL AND/OR Eric MCKINZIE any other adult residing at 211 Sunshine Avenue Winchester, OH 45697 are ordered to produce the children at the request of the agency caseworker and/or allow the worker access to the residence so that the worker may investigate the allegations in the case.  Specifically, the parties listed above shall permit the worker to access the residence where the child(ren) are located to ensure their safety.  Law Enforcement may assist the worker upon request.

(Doc. 99-4 at PageID 2670.)  The Magistrate's Order states that the facts of the complaint demonstrate the agency attempted to investigate reports regarding the minor children, but the parent avoided contact; the state is concerned with the safety and suitability of care being provided to the children; and the agency is granted protective supervision of the minor children pending further proceedings.  (*Id.*; *see* Doc. 105-22 at PageID 3086–87.[18])  The complaint upon which the Magistrate's Order is based relies upon multiple visits and attempted visits to Chappel's home and observations about known drug users in the premises, a woman hiding in the home after giving birth, requiring the child's removal and transportation for medical treatment, and the family avoiding contact with the Agency.  (*Id.*)  The complaint also describes that the agency observed the home and found it to be very dirty with known drug users living in

---

[18] For the sake of completing this analysis, the Court had to locate this Complaint on its own.  Neither party relied upon the Complaint in its analysis of probable cause.

the home. (*Id.*) There is a nexus between the place to be searched, Chappel's home, and the evidence to be seen (evidence of drug use and child neglect), as the home is where the children were residing and from which safety concerns arose. Thus, the Magistrate's Order demonstrates sufficient probable cause to justify the search for the purpose of a safety review and whether dependency of the children is established under Ohio Revised Code § 2151.04(C).[19]

Moore argues that the entry was an unconstitutional warrantless search of her house and disputes the validity of the Magistrate's Order, arguing that it was not valid because it was issued "only by a magistrate," lacked a required judicial signature, and was never adopted by a judge, rendering it void under Ohio law. (Doc. 131-2 at PageID 4726.) These arguments are insufficient based upon the above analysis and law to demonstrate that the Magistrate's Order was invalid or did not exist. The November 14, 2022 search of Chappel's home was based upon the Magistrate's Order that met the necessary legal requirements of a valid warrant.[20]

As the Magistrate Judge's Order meets the requirements of a valid warrant, Moore's search on November 14, 2022 was pursuant an exception to the Fourth Amendment. Thus, no constitutional violation has been established with respect to the November 14, 2022 search of Chappel's home, and Moore is entitled to qualified immunity on this claim.

### 2. Seizure of Chappel's Children

Chappel argues that Moore violated her Fourth Amendment rights by seizing her children on November 14, 2022. However, as Moore points out, Chappel may not assert a § 1983 on behalf of her children, who are not parties to this lawsuit. "[T]he Sixth Circuit has held that a parent may not bring a § 1983 claim for any alleged violation of the child's constitutional rights

---

[19] Neither Moore nor Chappel sufficiently briefed this issue. The Court supplies its independent analysis on this issue.

[20] Chappel also argues that access to her home was through coercion, but whether Chappel consented to the search of her home is irrelevant given that the Court has found Moore searched pursuant to the Magistrate's Order.

because such an action is 'entirely personal to the direct victim of the alleged constitutional tort.'" *Harris v. Cleveland City Bd. of Educ.,* No. 1:17-CV-00121, 2018 WL 1124961, at *3 (E.D. Tenn. Mar. 1, 2018) (citing *Jaco v. Bloechle*, 739 F.2d 239, 241 (6th Cir. 1984)). Chappel's children are not plaintiffs in this action, and Chappel may not represent her children's interests because she is not an attorney. *Id.* "While federal law provides that parties may plead and conduct their own cases personally, this right does not extend to representation of one's child." *Id*. (citing 28 U.S.C. § 1654; *Lawson v. Edwardsburg Pub. Sch.*, 751 F. Supp. 1257, 1258 (W.D. Mich. 1990) (while a litigant has the right to act as her own counsel, *see* 28 U.S.C. § 1654, a non-attorney parent is not permitted to represent the interests of her minor child)).  Thus, Chappel may not allege that her children were seized in violation of the Fourth Amendment as a basis for this claim, as her children would need to be parties to this action.[21]

Moreover, there is no dispute that Moore did not seize the children on November 14, 2022.  Moore left Chappel's home on November 14, 2022 after Chappel signed a safety plan and made arrangements for the children's grandmother to come later that day.  A person is seized under the Fourth Amendment "only when, by means of physical force or a show of authority, his freedom of movement is restrained." *D.J.Y., ex rel. York v. Ypsilanit Comm. Schs*., No. 14-cv-11467, 2015 WL 630860, at *7 (E.D. Mich. Feb. 12, 2015) (citing *U.S. v. Mendenhall*, 446 U.S. 544, 553 (1980) (dismissing Fourth Amendment claims against two defendants where neither officer was alleged to have committed any act that by means of physical force of a show of authority restrained the plaintiff's movement)).  Whether Chappel consented to her children's

---

[21] In other cases where the Court analyzes seizure of children in a custody context under the Fourth Amendment, the minor children are named parties. *See, e.g*., *Bambach v. Moegle*, 92 F.4th 615, 623 (6th Cir. 2024), *cert. denied,* 145 S. Ct. 281 (2024); *Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs*., 724 F.3d 687, 695–700 (6th Cir. 2013).

removal is more appropriately analyzed under the Fourteenth Amendment. Thus, Moore is entitled to qualified immunity on this claim, too.

        **3.**       **Search/Drug Test of Chappel**

There is no dispute that Chappel submitted to a drug test on November 14, 2022. She claims she did so under coercion or misrepresentation. Moore argues that she is not liable for conducting a drug test of Chappel because she did not conduct the test herself and because she obtained consent. A question of fact exists as to whether Chappel consented to the drug test on November 14, 2022.

Drug tests, which utilize blood-testing, breath-testing, or urinalysis, constitute searches that come under the ambit of the Fourth Amendment. *Relford v. Lexington-Fayette Urb. Cnty. Gov't*, 390 F.3d 452, 457 (6th Cir. 2004) (citing *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 616–17 (1989)). Valid consent to a search or seizure is an exception to the warrant requirement. *Andrews*, 700 F.3d at 854; *Bambach*, 92 F.4th at 628. Moore argues that the consent exception applies, whereas Chappel asserts there is a question of fact as to whether her consent was freely and voluntarily given.

"Under the consent exception, the search is not unreasonable so long as the owner gives free and voluntary consent." *Pop v. Brookfield Chrysler Dodge Jeep, Inc.,* No. 24-1201, 2025 WL 1010448, at *3 (6th Cir. April 2, 2025) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). "Consent is voluntary when it is 'unequivocal, specific and intelligently given, uncontaminated by any duress or coercion.'" *Id*. (citing *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011) (citation omitted)). "The determination of the voluntariness of the consent is a fact question to be determined by the 'totality of all the circumstances.'" *Id*. (citing

*United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999) (quoting *Schneckloth*, 412 U.S. at 227)).

Moore argues that she obtained Chappel's consent for a saliva drug test. She also argues the test did not produce results. The latter point is of no relevance as Chappel still underwent the test itself. As to the former, for what is an incredibly fact-specific analysis based upon the totality of the circumstances as to whether Plaintiff gave voluntary and free consent, the Court has very little information to examine. The facts in the record with respect to whether Plaintiff consented to a drug test are Moore's brief statements in her Declaration stating that Chappel refused a urine test but "agreed to take an instant mouth swab[.]" (Doc. 99-1 at PageID 2644.) Moore offers no analysis about whether Chappel voluntarily consented and relies solely on her Declaration. Moore's Declaration does not state whether Moore asked Chappel to undergo an instant mouth swab test, who administered the test, and what language was used to give consent to the test.

Chappel raises many arguments, only some of which are supported by record evidence, and even this caused frustration to the Court because she provides scattered citations and does not identify the relevance of the documents to which she cites. Nonetheless, a question of material fact exists because that the Court is unable to conclusively determine whether Chappel freely and voluntarily consented to a drug test on November 14, 2022.[22] In her Response to Moore's Statement of Undisputed Facts (Doc. 131-1), Chappel points to a page from her deposition in support of her argument that she was told she was ordered by the court to comply and that Moore administered the mouth swab herself to her. (Doc. 87 at PageID 1596.) This

---

[22] There is also a question of fact as to who performed the drug test. Moore attests that she contacted Denise Sowards of the Agency to come to attempt the instant mouth swab, but Chappel could not provide enough saliva for the test to work. (*Id.*) Chappel testified that Moore administered the drug test on November 14, 2022. (Doc. 87 at PageID 1596.)

29

page of deposition includes Chappel's testimony that "she [Moore] did drug test me on November 14th."[23]  (*Id.*)  In what appears to be Moore's Activity Log summarizing the events of November 14, 2022, Moore describes the drug testing without any mention of obtaining consent. (See Doc. 115-15 at PageID 3536.)  Based on this limited evidence, there remains a genuine dispute of fact over whether Moore consented to the drug test.

Moore alternately argues that even if Moore told Plaintiff a court order required her to take the drug test, this was a reasonable mistake of fact and does not strip Moore of qualified immunity, relying upon *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  She asserts that a reasonable child services worker would have understood the broad language in the Magistrate's Order stating that she "investigate" the facts as requiring Plaintiff to submit to a drug test if the facts warranted it.  However, she does not cite any law supporting the proposition that a case worker may drug test an individual while executing a warrant for a home search.  Nor does she cite any evidence that she was indeed mistaken about the contents of the Magistrate's Order. Moore also argues that the drug testing was reasonable under the circumstances as she observed Plaintiff's home to be dirty and unkempt there were numerous individuals known to Moore to abuse drugs inside and outside of Plaintiff's home.  She also had concerns that Plaintiff was using drugs.

Chappel relies upon the Sixth Circuit's ruling vacating the district court's judgment in part and affirming in part its decision to *sua sponte* decision to dismiss her *pro se* Complaint. No. 23-3526, Doc. 21 at PageID 588–89.  With respect to her Fourth Amendment claim alleging that Moore violated her Fourth Amendment right by requiring her to submit to a drug test, the Sixth Circuit considered Chappel's allegations that she initially refused a drug test but then

---

[23] However, Chappel did not cite deposition testimony that she was told she was court-ordered to comply.

consented under alleged duress, as Chappel alleged that Moore entered her home with the chief of police and a maintenance man, threatened to take custody of her children, and told Chappel she was "required" to submit to a drug test. (*Id*. at PageID 590.)  The Sixth Circuit concluded that the allegations were sufficient to "plausibly allege" that Chappel consented to the drug test only under duress.  While Chappel conflates the standard on a motion to dismiss with that of summary judgment and qualified immunity, there indeed remains a question of fact on the issue of consent.

The law is clear that valid consent to a search or seizure is an exception to the warrant requirement, but the Court is unable to conclude based on this evidence that the alleged consent was voluntarily and freely given.  *Andrews*, 700 F.3d at 854; *Bambach*, 92 F.4th at 628.  There is also a question of fact as to who conducted the drug test at issue.

### b.      Whether Moore Violated Clearly Established Law

The second prong of the qualified immunity analysis is whether the alleged conduct violated clearly established law.  This is Plaintiff's burden to carry.  "In the Sixth Circuit, when a defendant invokes qualified immunity it becomes the plaintiff's burden to demonstrate: (1) that the defendant violated a constitutional right and (2) that this right was clearly established at the time of the alleged violation."  *Clark,* 998 F.3d at 298. The Court's analysis on this issue is focused only on the drug testing, Chappel's third claim.

"A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Kovacic*, 724 F.3d at 699.  "The objective legal reasonableness standard requires us to analyze whether a case worker in [the social workers'] position objectively would have understood that she was under an affirmative duty to have refrained from such conduct."  *Id*. (citing *Jordan v. Murphy,* 145 F.

App'x 513, 517 (6th Cir. 2005) (internal quotation marks omitted)). "When determining whether a constitutional right is clearly established, we look first to decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeal." *Id*. (citing *Andrews*, 700 F.3d at 853).

The parties not did not adequately brief the second prong of the qualified immunity analysis. Moore devotes less than one page to analysis on whether all of the alleged violations of the Fourth and Fourteenth Amendment asserted violated clearly established law. (*See* Doc. 102 at PageID 2773.) She argues in her initial Motion (before Plaintiff filed a Response) with respect to this issue that "Plaintiff cites no cases clearly establishing (1) a children services worker who mistakenly interprets a court order allowing them to investigate allegations of dependency and ensure a child's safety (2) violates the Fourth Amendment if the children's services worker misrepresents to the parent that a drug test is required under such order." (*Id*. at PageID 2773–74.) This is not the issue before the Court as there is no evidence of mistake in the record.[24]

Plaintiff's argument on this point is minimal at best and also does not address the issue. Plaintiff bears the burden to show the law was clearly established. She argues that government officials violate clearly established law when they remove children or search a home without a warrant, exigent circumstances, or valid consent, relying upon two cases without any further analysis. *See Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1315 (10th Cir. 1999); *Clark*, 998 F.3d at 301. Again, the argument misses the point as the cited law does not address drug testing.

The question before the Court is, taking Plaintiff's version of events as true, does a caseworker violate clearly established law when she lies about the contents of a court order or

---

[24] In fact, as Moore participated in obtaining a warrant by submitting the affidavit in support of the Magistrate's Order (and requesting a search of the home), it appears she was aware of the law and contents of the Magistrate's Order.

misrepresents/misunderstands its contents by communicating that the parent is required to undergo drug testing? Neither party briefed this issue. As such, Plaintiff has not carried her burden to demonstrate the law was clearly established. Moore is, therefore, entitled to qualified immunity on this claim, too.

### ii. Fourteenth Amendment

Moore asserts that she is entitled to qualified immunity on Chappel's claim that she violated Chappel's Fourteenth Amendment substantive and procedural due process rights by removing her children from her home on November 14, 2022 and depriving Chappel of her parenting rights between November 14 and 23, 2022.

"The Constitution clearly protects both a 'procedural due process interest in parenting a child and a substantive fundamental right to raise one's child.'" *Bambach*, 92 F.4th at 623–24 (citing *Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000)). The Fourteenth Amendment requires states to provide "due process of law" before depriving "any person of life, liberty, or property." *Id*. (citing U.S. Const. amend XIV, § 1). "Procedural due process rights protect individuals 'from deficient procedures that lead to the deprivation of cognizable liberty interests.'" *Id.* (citing *Bartell*, 215 F.3d at 557). "Substantive due process protections ensure that—regardless of the procedural protections available—the government 'may not deprive individuals of fundamental rights unless the action is necessary and animated by a compelling purpose.'" *Id*. (citing *Bartell*, 215 F.3d at 557–58).

"The Fourteenth Amendment's procedural protections extend to the 'liberty interest' in the 'parent-child relation,' an interest a parent may not 'be deprived of absent due process of law.'" *Id*. (citing *Smith v. Williams-Ash*, 520 F.3d 596, 599–600 (6th Cir. 2008)). "Absent certain exigent circumstances, the state's termination of or interference with parental rights—

33

even temporarily—requires some measure of procedural protection, like proper notice and an opportunity for a hearing." *Id.* "Another circumstance that removes the state's obligation to provide additional process before removal from custody is a parent's consent or lack of objection to the removal." *Id.*

"[T]he Fourteenth Amendment's substantive protections also extend to the fundamental right that parents have to the 'companionship, care, custody and management' of their children." *Id*. (citing *Schulkers*, 955 F.3d at 539–40).  However, that right to family integrity and association without state interference is limited by "an equaling compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents." *Id*. (citing *Kottmyer v. Maas,* 436 F.3d 684, 690 (6th Cir. 2006)).  "Like for most constitutional rights, valid consent to waive a right to substantive due process typically extinguishes corresponding protections against state action." *Id.* at 625.  *See Williams-Ash*, 520 F.3d at 599–600; *Siefert v. Hamilton County*, 951 F.3d 753, 763 (6th Cir. 2020) ("[C]onsent extinguishes constitutional procedural safeguards."); *see also Andrews*, 700 F.3d at 859 (explaining that social workers may obtain consent—waiving Fourth Amendment protections—to enter a property without a warrant).

### a.      Substantive Due Process

### 1.      Constitutional Violation

Chappel alleges Moore violated her substantive due process right to parent her children. Moore contends that Chappel consented to a safety plan, which placed her children with their grandmother during this time, but still allowed her access to her children.[25]  She alternatively

---

[25] On November 23, 2022, the juvenile court issued a Magistrate's Decision and Judgment Entry on Adjudication in which Chappel's minor children were found to be dependent and set forth a plan for committing the children to the temporary custody of ACCS.  (Doc. 99-6.)  "[C]ounty caseworkers cannot be held liable for a juvenile court's decision to deprive a parent of custody '[b]ecause Ohio law refers custody decisions to the juvenile court, which has

argues that even if she caused a constitutional deprivation, her conduct was not constitutionally repugnant.

To determine whether a substantive due process violation has occurred, the Court examines (1) whether the plaintiff has shown a deprivation of a constitutionally protected liberty interest; and (2) whether the government's discretionary conduct that deprived the interest was constitutionally repugnant. *Clark*, 998 F.3d at 299. "Where state employees remove children from their parents' care without a valid court order and without either parental consent or pre-removal process, the state workers violate either the Fourth or Fourteenth Amendment—or both."[26] *Bambach*, 92 F.4th at 623. "At the other end, though, where state workers receive parental consent to temporarily remove children from custody, the state employees do *not* violate any constitutional rights, even if they do not obtain a court order or follow any other process for the removal." *Id*. (citing *Smith*, 520 F.3d at 599–600 (6th Cir. 2008)); *see also Teets,* 460 F. App'x at 503. In *Smith*, a case upon which Moore heavily relies, the caseworker persuaded the parents to consent to a safety plan that removed the children from the home and placed them elsewhere. 520 F.3d at 598. The Sixth Circuit affirmed the district court's decision that there was no constitutional deprivation under the Fourth or Fourteenth Amendment, as the parents consented to the safety plan. *Id*. at 599–600. Two critical facts distinguish the *Smith* case from this one. In *Smith*, the parents did not argue that they involuntarily consented to enter the safety plan, as Chappel does here, and the safety plan entered into the record included language informing the Smiths that the "decision to sign this safety plan is voluntary," of which there is no

_____

independent authority to conduct hearings and collect evidence.'" *Arsan v. Keller*, 784 F. App'x 900, 910 (6th Cir. 2019) (citing *Teets v. Cuyahoga Cnty.,* 460 F. App'x 498, 502 (6th Cir. 2012)).

[26] As noted, however, § 1983 claims are individual to the party who suffered the harm. Thus, the Court limits its analysis to the Fourteenth Amendment in his case, as the minors involved are not parties to the action.

35

comparable evidence here. *Id*. at 598, 600. Therefore, although this case is certainly relevant, it is not dispositive of the issue before this Court.

Moore argues that she obtained Chappel's consent for the safety plan. The evidence upon which she relies is once again her Declaration, in which she attests that Chappel consented to a safety plan on November 14, 2022. (Doc. 99-1 at PageID 2646.) Moore attested that she "informed Ms. Chappel that I would like for her to find somewhere else for her children to go because of the conditions of her home and concerns that she and Eric were using drugs." (*Id*. at PageID 2645.) Chappel contacted the children's grandmother to have her pick up the children. (*Id*.) Moore went over a safety plan with Chappel, which Chappel "ultimately agreed to and signed." (*Id*.) Moore was given instruction from her supervisor to leave Chappel's home after obtaining consent to the safety plan. (*Id*.)

Chappel's arguments that she consented due to duress or coercion are primarily argument, and she does little to identify with particularity what evidence she relies upon and why. The most relevant and helpful document cited by Chappel is an Activity Log Report drafted by Moore describing the visit to Chappel's house on November 14, 2022. (Doc. 115-15 at PageID 3535.[27]) Read in a light most favorable to Plaintiff, Moore's own summary fails to demonstrate consent was freely and voluntarily given. Rather, it includes evidence that Chappel signed the safety plan because she was "informed she needed to sign[,]" which suggests coercion or misrepresentation. (*Id*.) Language such as Moore "informed" Chappel she needed to sign the plan and that she was given direction from her supervisor to leave after "getting the parents to sign" cuts against the argument that consent was freely and voluntarily given but rather suggests that it was expected or required. (*See* Doc. 115-15.)

---

[27] As noted above, the Court reviewed the cited page as well as the pages before and after to attempt to understand the document.

At her deposition, Chappel was scantly asked about the safety plan. (*See* Doc. 87.) The word "consent" was not mentioned once when she was deposed. Rather, the most relevant testimony is as follows:

> Q. And on November 14th did you sign a – I just want to get the terminology correct. Did you sign a safety plan on November 14th?
> A. I was told it was a care plan. But, yeah, after four hours and being told that Moore was not going to leave until we signed the documents, we signed them.

(*Id.* at PageID 1608.) Once again, whether consent was freely and voluntarily given is a fact-driven analysis, and the facts before the Court do little to inform whether Chappel gave her consent for the safety plan freely and voluntarily. Based on the evidence before it, there is a question of fact on this issue.

And, as there is a question of fact as to whether Plaintiff consented to the safety plan and under what circumstances, there is a question of fact as to whether Moore's conduct shocks the conscience under the second prong of the test for substantive due process. "Where social workers are afforded a reasonable opportunity to deliberate various alternatives before deciding on a course of action, their actions will be deemed conscience shocking if they were taken with 'deliberate indifference' towards the plaintiff's federally protected rights." *Holliday v. Leigh*, No. 2:17-cv-113, 2020 WL 3217666, at *7 (E.D. Ky. June 15, 2020) (citing *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000)); *see also Farley v. Farley*, Nos. 98-6114, -6115, 2000 WL 1033045, at *1-2, 2000 U.S. App. LEXIS 17580, at *4 (6th Cir. July 19, 2000). "Deliberate indifference requires that the officials knew of facts from which they could infer a substantial risk of serious harm, that they did infer it, and that they acted with indifference toward the individual's rights." *Id*. (citing *Range v. Douglas*, 763 F.3d 573, 590 (6th Cir. 2014)). "More than negligence is required to satisfy the deliberate indifference standard." *Id.* "The conduct must be that which is intended to injure without any justifiable government interest or at

37

the very least, in appropriate cases, the actions must reflect recklessness or gross recklessness and offend traditional notions of fair play and decency." *Id.* (citing *Cnty. Of Sacramento v. Lewis*, 523 U.S. 833, 846-49 (1998) (cleaned up)).

On this record, the Court simply does not have adequate information to make a determination about whether Moore acted with deliberate indifference. This determination also hinges upon whether Moore acted with Chappel's voluntary consent. This, too, is a question of fact.

### 2. Clearly Established Law

Taking Plaintiff's version of the facts as true, the law is clearly established that forcing a parent to sign a safety plan under duress and without voluntary consent violates the law. Again, neither party adequately briefed this issue. However, Plaintiff broadly cites the legal proposition that Government officials violate clearly established law when they remove children without a warrant, exigent circumstances, or valid consent. *See Clark*, 998 F.3d at 301; *Malik*, 191 F.3d 1306. In *Clark*, the Court recognized the general notion that the due process clause protects the right to bring up one's child.[28] 998 F.3d at 299–301. In *Malik*, the Tenth Circuit Court of Appeals found that "except in extraordinary circumstances, a parent has a liberty interest in familial association and privacy that cannot be violated without adequate pre-deprivation procedures." 191 F.3d at 1315. This Court has recognized that "[t]he Supreme Court has called parents' 'care, custody, and control of their children . . . perhaps the oldest of the fundamental liberty interests recognized by this Court.'" *Leta v. Hamilton Cnty. Dep't of Job & Fam. Servs.*, 668 F. Supp. 3d 724, 735 (S.D. Ohio 2023), *aff'd sub nom. Leta v. TriHealth, Inc.,* No. 23-3406, 2024 WL 229563 (6th Cir. Jan. 22, 2024) (quoting *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 762

---

[28] The issue before the Court, however, was whether there is law from the Supreme Court or this Circuit demonstrating that there is a clearly established right to use corporal punishment that leaves marks. 998 F.3d at 300.

(6th Cir. 2020) (citing *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion))).

The district court in *Holliday v. Leigh* determined that "while mere investigations into allegations of child abuse do not implicate that right, implementing restrictive prevention plans and using baseless threats to secure and ensure compliance do, and it has been so for several years." 2020 WL 3217666, at *9 (E.D. Ky. June 15, 2020) (denying qualified immunity and finding numerous Supreme Corut cases have found that a parent has a fundamental right to the companionship, care, custody and management of his or her children and so long as a parent adequately cares for her child, there will be no reason for the state to inject itself in to the private realm of the family) (citing *Lassiter v. Dep' of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27 (1981) and *Troxel v. Granville*, 530 U.S. 57, 68–69 (2000)). A caseworker may threaten legal action she has the right to take but securing compliance with unfounded and unenforceable threats can amount to an unconstitutional circumvention of procedural protections. *Holliday*, at *10. Accepting Plaintiff's version of the facts as true, the law is clearly established that coercing consent to a safety plan violates a parent's clearly established rights.

### b.     Procedural Due Process

To establish a procedural due process violation, Chappel must show (1) she was deprived of a protected liberty, and (2) that such deprivation occurred without requisite due process. *Pittman*, 640 F.3d at 729. Moore asserts there was no deprivation, because it was the juvenile court's responsibility to ensure Plaintiff received adequate notice of the custody proceedings.

### 1.     Constitutional Violation

Where a parent voluntarily consents to a safety plan, no hearing is necessary, as hearings are required for deprivation taken over objection, not for steps authorized by consent. *Williams-*

39

*Ash*, 520 F.3d at 600. However, there is a question of fact as to whether Plaintiff voluntarily consented to the safety plan at issue. Further, contrary to Moore's argument, a parent's liberty interest may be violated by a temporary removal plan. *See Holliday*, 2020 WL 3217666, at *10. The following three factors guide the inquiry into whether Chappel's liberty interest in making decisions regarding the care, custody, and control of her children received adequate procedural due process:

> first, courts consider the private interest affected by the official action; second, courts consider the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, courts consider the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Id*. at *9 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1876)).

"The Sixth Circuit has long recognized that an analysis of the above factors leads to the conclusion that 'notice and opportunity to be heard are necessary before parental rights can be terminated.'" *Id*. (citing *Anh v. Levi*, 586 F.2d 625, 632 (6th Cir. 1978)). "Although the curtailments of parental rights at issue here are less extreme than removing the child from parental custody, 'they may be invasive enough to count as a deprivation of liberty, thus triggering the right to a hearing' or other procedural safeguards." *Id*. (citing *Dupuy*, 465 F.3d at 760.)

"Appellate courts have found prevention plans procedurally problematic based on facts similar to those of this case." *Id*. (citing *Schulkers v. Kammer*, 955 F.3d 520, 542–49 (6th Cir. 2020)). "While it is not improper to threaten legal actions one has the right to take, securing compliance with a prevention plan by making unfounded and unenforceable threats can amount to an unconstitutional circumvention of procedural protections." *Id.* "The involuntary imposition and maintenance of prevention plans can also result in an unconstitutional deprivation

of procedural process." *Id*. at \*10 (citing *Smith*, 520 F.3d 596, discussing its procedural history, and noting that the issue of qualified immunity hinged upon whether the parents voluntarily consented to the safety plan at issue). "Impingements on a parent's right to make decisions concerning the care and control of her child imposed over objection and maintained with no clear procedural redress are unconstitutional deprivations of procedural due process." *Id*. (citing *Smith,* 520 F.3d at 600).

In *Holliday*, the court found that a genuine issue of material fact existed over whether the parent signed the safety plan voluntarily where the plan did not indicate it was a voluntary agreement, she protested before signing, and the caseworker threatened to immediately take her child if she refused to sign. *Id.* Further, the plan in *Holliday* failed to provide the parent with a procedural road map for how to obtain relief from its restrictions. These same factors are present in this case. In fact, the parties do not address whether Chappel was given any procedural roadmap for how to obtain relief from the safety plan.

Here, like in *Holliday*, Plaintiff alleges she had no notice of her rights, no notice that her consent should be voluntary, and no means to contest the action taken. Questions of fact persist as to whether Moore violated Chappel's constitutional right to procedural due process when she allegedly coerced her into agreeing to the restrictions and then maintained the restrictions despite her protests. This is so because "[w]hile the state certainly has an interest in preventing child abuse, that interest does not permit social workers to circumvent the procedural protections afforded by state law, e.g., reasonable cause requirements and mandated hearings." *Id*.

### 2. Clearly Established Law

The issue of whether the law is clearly established was not well briefed. Again, Plaintiff generally alleges that government officials violate clearly established law by removing children

or searching a home without a warrant, exigent circumstances, or valid consent. *See Clark*, 998 F.3d at 301; *Malik*, 191 F.3d 1306. Accepting Plaintiff's version of events as true, the issue is whether it violates clearly established law to remove children through a temporary removal plan by forcing a parent to sign a safety plan removing the children from the parent's custody without being offered procedural safeguards. The broad principle cited by Plaintiff is sufficient to demonstrate the law was clearly established. Again, this Court has recognized the fundamental liberty interest that parents have the right to the care, custody, and control of their children. *See Leta v. Hamilton Cnty. Dep't of Job & Fam. Servs.*, 668 F. Supp. 3d at 735 (S.D. Ohio 2023) (quoting *Siefert.*, 951 F.3d at 762 (6th Cir. 2020) (citing *Troxel*, 530 U.S. at 65)).

"[A] social worker cannot impose such significant restrictions under duress and then maintain them in light of protest without offering procedural safeguards." *Holliday*, 2020 WL 3217666, at *10; *see Smith*, 520 F.3d at 600 ("when a parent voluntarily consents to a safety plan, 'no hearing of any kind is necessary; hearings are required for deprivations taken over objection, not for steps authorized by consent.'") "That principle and the cases discussed above have been around for several years." *Holliday*, 2020 WL 3217666, at *10 (citing cases). Thus, the right to be provided notice prior to one's parental rights being rescinded without valid consent as well as offering procedural safeguards to protest is clearly established.

In sum, questions of fact preclude summary judgment and qualified immunity on Chappel's § 1983 claim based upon Fourteenth Amendment substantive and procedural due process violations. Plaintiff's § 1983 claim against Moore based upon substantive and procedural due process violations of the Fourteenth Amendment, therefore, will proceed to trial.

### 3.    FHA Retaliation

Finally, Moore moves for summary judgment on Chappel's FHA retaliation claim. Under the FHA, it is "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed … any right granted or protected by  3603, 3604, 3605, or 3606 of this title."  42 U.S.C. § 3617.  This claim requires showings by a plaintiff "(1) that [s]he exercised or enjoyed a right guaranteed by §§ 3603–3606; (2) that the defendant's intentional conduct constituted coercion, intimidation, threat, or interference; and (3) a causal connection between h[er] exercise or enjoyment of a right and the defendant's conduct."  *Lawrence Cnty. Recovery, LLC v. Vill. Of Coal Grove, Ohio*, 784 F.Supp.3d 1050, 1070 (S.D. Ohio 2025) (citing *Hood v. Midwest Sav. Bank*, 95 F. App'x 768, 779 (6th Cir. 2004)).  "In this Circuit, a plaintiff is required to demonstrate 'discriminatory animus' to prevail on an interference claim under the [FHA]."  *Kooman v. Boulder Bluff Condos.*, 833 F. App'x 623, 630–31 (6th Cir. 2020) (quoting *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 613 (6th Cir. 2012)) (internal quotation omitted).

Chappel has failed to come forward with sufficient evidence to support the elements of this claim.  She has not demonstrated a causal connection between her exercise of a right and Moore's conduct.  She also has not identified evidence of discriminatory animus so as to demonstrate that Moore interfered with her housing rights by virtue of her involvement in her custody case.  Moore, on the other hand, submitted her Declaration attesting that she was not involved with Chappel's housing and took no part in the eviction proceedings against her. (Moore Decl., Doc. 99-1 at PageID 2646; *see also* Chappel Dep., Doc. 87 at PageID 1573–74.) Chappel has not presented sufficient evidence to support the necessary elements or to

43

demonstrate that Moore acted with the discriminatory animus necessary for Chappel to prevail on this claim.  This claim fails as a matter of law.

### C.     CONCLUSION

In sum, Moore's Motion for Judgment on the Pleadings (Doc. 85) is **DENIED**.  Moore's Motion for Summary Judgment (Doc. 102) is **GRANED IN PART AND DENIED IN PART.** Moore is entitled to qualified immunity on Chappel's § 1983 claims for Fourth Amendment right violations based upon the alleged improper search of her home, seizure of her children, and search of her body (drug testing).  Questions of fact preclude qualified immunity and summary judgment on Chappel's § 1983 claim based upon substantive and procedural due process violations based upon execution of the safety plan.  Lastly, Moore is entitled to summary judgment on Chappel's FHA retaliation claim.

## III.     ANDERSON'S MOTIONS (DOCS. 100, 101)

Anderson filed both a Motion to Dismiss and a Motion for Summary Judgment.  (Docs. 100, 101.)  For the reasons that follow, the Court will deny the former and grant the latter.

### A.     Motion to Dismiss

Anderson moves to dismiss due to lack of jurisdiction on the basis of the *Rooker-Feldman* doctrine.  (Doc. 100.)  Anderson asserts that the relief Plaintiff seeks is to void orders of the Adams County Court, Fourth District Court of Appeals for the State of Ohio and the Ohio Supreme Court and are therefore barred by the *Rooker-Feldman* doctrine.

### 1.     Standard of Law

Rule 12(b)(1) authorizes a dismissal of a complaint where the Court lacks jurisdiction over the subject matter of the complaint.  *See* Fed. R. Civ. P. 12(b)(1).  The plaintiff has the burden of establishing the Court's jurisdiction when such a dismissal motion is filed under Rule

44

12(b)(1). *See Rogers v. Stratton Industs., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986). The Court can "look beyond the jurisdictional allegations in the complaint and consider submitted evidence." *Taylor v. KeyCorp*, 680 F.3d 609, 612 (6th Cir. 2012). Finally, the Court can resolve factual disputes without converting a Rule 12(b)(1) motion to a motion for summary judgment. *Rogers*, 798 F.2d at 915.

### 2. *Rooker-Feldman* Doctrine

The *Rooker-Feldman* doctrine "is a narrow rule based on the idea that federal appellate jurisdiction over a state court decision lies exclusively with the Supreme Court, and not lower federal courts." *Durham v. Haslam*, 528 F. App'x 559, 563 (6th Cir. 2013). The *Rooker-Feldman* doctrine bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indust. Corp.*, 544 U.S. 280, 284 (2005). However, it does not "stop a district court from exercising subject matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Id*. at 293. To determine whether the *Rooker-Feldman* doctrine bars a claim, the court must first look to the source of the injury the plaintiff alleges in the federal complaint. *Cunningham v. Dep't of Children's Servs.*, 842 F. App'x 959, 963 (6th Cir. 2021). If the source of the injury claimed is the state-court judgment, *Rooker-Feldman* applies and the Court lacks jurisdiction. *Id*. The source of the injury is determined by the requested relief. *Id*.

Chappel alleges Anderson retaliated against her in violation of the FHA. "The [FHA] prohibits discrimination in the sale or rental of housing because of 'race, color, religion, sex, familial status, or national origin.'" *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 230 (6th

45

Cir. 2003) (quoting 42 U.S.C. § 3604). Amendments to the FHA added protections for disabled persons. *See Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 537–38 (6th Cir. 2014) (discussing the Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 and 42 U.S.C. § 3604(f)(2)). As the Magistrate Judge previously discussed, in her Amended Complaint, Plaintiff appears to allege retaliation for her protected activity of opposing disability discrimination. (*See* Doc. 10-1 at PageID 265 (plaintiff refers to herself as a "recovering addict")). The FHA "prohibits intentional discrimination against disabled persons, including recovering addicts." *Get Back Up, Inc. v. City of Detroit, Mich.*, 725 F. App'x 389, 392 (6th Cir. 2018) (citing *MX Grp. v. City of Covington*, 293 F.3d 326, 332–40 (6th Cir. 2002)). The Court, therefore, proceeds on this understanding of Plaintiff's claim.

To prove her claim, Chappel must show "(1) that [s]he exercised or enjoyed a right guaranteed by §§ 3603–3606 [of the FHA]; (2) that the defendant's intentional conduct constituted coercion, intimidation, threat, or interference; and (3) a causal connection between h[er] exercise or enjoyment of a right and the defendant's conduct." *Lawrence*, 784 F.Supp.3d at 1070. Chappel must also prove discriminatory animus to prevail on her claim. *Kooman,* 833 F. App'x at 630–31.

Chappel seeks relief in her Amended Complaint related to her eviction proceeding. Specifically, she asks the Court to "stop the eviction process until we can find a place to rent." (Doc. 43 at PageID 960.) She also requests $50,000 in compensatory damages and $1000,000 in punitive damages. (*Id*.) Anderson highlights that in seeking a preliminary injunction, Chappel sought the following relief:

1) Cease reporting any alleged debt to HUD or credit agencies pending full review of the improper recertification and rent calculations.

2) Provide corrected documents to all housing authorities and assistance programs confirming that the eviction resulted from procedural violations rather than tenant fault.

3) Release all photographic evidence, communications between agencies, and documents related to the coordinated actions between housing authorities and children's services, including a detailed accounting of all rent calculations, credits, and charges from February 2021 forward.

4) Be prohibited from using the improper eviction or alleged debt as grounds to deny future housing assistance applications and mandate written confirmation to any requesting housing authority plaintiff's eviction was not the result of her fault.

(Doc. 55 at PageID 1170; Doc. 34 a PageID 569–60.)  Anderson asserts that Chappel seeks to have this Court void state court orders related to her eviction proceeding, all of which is barred by the *Rooker-Feldman* doctrine.  Anderson also argues that to the extent Chappel asserts her eviction was retaliatory, the Ohio Civil Rights Commission investigated and "ruled on that matter."  (Doc. 100 at PageID 2693.)  In support, Anderson relies upon the Letter of Determination issued by the Ohio Civil Rights Commission on August 15, 2024, in which it determined it was not probable that Anderson engaged in an unlawful discriminatory practice in violation of Ohio Revised Code Chapter 4112.  (Doc. 97-13.)

Chappel responds that she is not seeking to overturn her eviction judgment and instead "seeks redress" for retaliation, which is separate misconduct.[29]  She seems to argue that she engaged in protected activity of filing grievances, contacting public officials, filing administrative complaints, and "challenging Defendants' conduct," which is an improper expansion of the allegations this claim proceeded on.  (Doc. 128 at PageID 4651.)

Plaintiff's requested relief in the Complaint of "stopping" or barring the eviction proceeding is barred by the *Rooker-Feldman* doctrine, as the source relief requested is state court

---

[29] Chappel attempts to insert new claims, including "fraud and constitutional violations" and claims under § 1983 and § 1985, which the Court will not consider and borders on misrepresenting the claims before the Court.  **Plaintiff is admonished that her attempt to belatedly insert new claims in this action is improper.**  The Court limits its analysis to the single claim of FHA retaliation against Anderson.  (*See* Doc. 128 at PageID 4646.)

judgments relating to her eviction. However, her claims regarding retaliation for filing a HUD grievance and opposing disability discrimination on the basis of her status as a recovering drug addict are not barred by the *Rooker-Feldman* doctrine. As such, the Court will proceed to Anderson's Motion for Summary Judgment on that narrowed basis.

### B. Motion for Summary Judgment

Anderson moves for summary judgment on the basis that Chappel is unable to meet the elements of an FHA retaliation claim. To prevail on her FHA retaliation claim, Chappel must prove: (1) that she exercised or enjoyed a right guaranteed by §§ 3603–3606 of the FHA; (2) that Anderson's intentional conduct constituted coercion, intimidation, threat, or interference; and (3) a causal connection between her exercise or enjoyment of a right and Anderson's conduct. *Lawrence,* 784 F.Supp.3d at 1070. Chappel must demonstrate "discriminatory animus" to prevail. *Kooman*, 833 F. App'x at 630–31.

Although this is a straightforward claim, Plaintiff's pleadings raise a number of unrelated arguments and theories that are not before the Court, which the Court will not consider.[30] What is before the Court is a narrow claim: did Anderson, who is employed by AMHA, retaliate against Chappel on the basis of her filing various complaints (which were not well-identified in the record, and the dates for which the Court had to attempt to locate on its own)? The answer is no: the evidence does not support this claim.

Of the three elements needed to prove this claim, Anderson concedes the first element is met by Anderson filing a complaint with the Ohio Civil Rights Commission. At the time Plaintiff brought this claim, she relied upon and attached to her proposed Amended Complaint a complaint she filed with the U.S Department of Housing and Urban Development, Office of Fair Housing and Equal Opportunity on April 25, 2022. (Doc. 10-1 at PageID 264–66.) In that letter,

---

[30] Once again, Plaintiff attempts to add claims and expand the litigation. The same admonishment applies.

she claims that Anderson was discriminating against her since before she moved in because she is a recovering addict and she learned "she had a son overdose in the past." (*Id.*) It was on this basis the Magistrate Judge ordered Plaintiff's FHA claim could proceed.

Now at this stage, Plaintiff is attempting to broaden her claim by referencing other complaints she filed. It was difficult to discern when Plaintiff's other complaints were filed as Plaintiff never identified the dates. As best the Court can discern, according to her deposition, she filed a Complaint with the Ohio Civil Rights Commission on October 13, 2023 against Anderson for "retaliatory eviction." (Doc. 87 at PageID 1550, 1692.) On February 8, 2024, the Ohio Civil Rights Commission noted Chappel made duplicate filings and administratively closed the duplicate complaint. (*Id.* at PageID 1694.) Chappel made another complaint to the Ohio Civil Rights Commission sometime prior to February 8, 2024. (*Id.* at PageID 1552.) The Ohio Civil Rights Commission found it was not probable that Anderson engaged in retaliation. (Doc. 97-13 at PageID 2616–17.) For sake of analysis, both the HUD and Ohio Civil Rights Commission complaints are protected activity sufficient to satisfy the first element of the test.

As to the second element, Plaintiff's claim proceeded upon the allegation that she filed a complaint for harassment and Anderson retaliated against her by initiating eviction proceedings and terminating her housing lease. (Order, Doc. 42 at PageID 927.) For purposes of this claim, the Court narrows the adverse action to that of the eviction proceeding and termination of her lease. The eviction complaint was filed by AMHA on July 2, 2024, and judgment was entered on July 31, 2024.[31] (Doc. 97-1, 97-4.)

Plaintiff's claim is foreclosed by lack of causal connection, the third element. Plaintiff asserts that causal connection is met because of the temporal proximity between filing her

---

[31] Yet again, Plaintiff attempts to broaden this analysis to many perceived slights relating to her landlord-tenant relationship with Anderson. (Doc. 129 at PageID 4657.) Plaintiff cites, without any direct quotation or specificity, 13 exhibits in support of these broad allegations. These arguments are not well-taken.

complaints and being evicted, as well as a general antagonism from Anderson.   Anderson asserts that admitted lease violations and the judgment conclusively establishing those lease violations were the basis for her adverse action.  This point was not well briefed, but it is dispositive.

AMHA initiated eviction proceedings due to unauthorized people residing in Chappel's residence, unauthorized pets present in the residence, drug use at the residence, and failure to maintain the condition of the property in a clean, sanitary, and safe manner, which is documented in the eviction filings.  (Doc. 97-1 at PageID 2401.)  The conditions are also described in Moore's Activity Log and Declaration.  (*See* Docs. 115-15; 99-1.)  Plaintiff failed a drug test at her November 21, 2022 court hearing, demonstrating drug use.  (Doc. 97-4.)

Plaintiff admitted to the lease violations on the record.  (*Id*.)  Although Plaintiff disagrees with the evidence and state court rulings, the evidence squarely establishes Plaintiff violated her lease and was evicted as a result.  Thus, the evidence demonstrates that the admitted lease violations were the cause of the eviction.[32]  A plaintiff is unable to establish retaliatory motive was the "but-for" cause of her eviction where a state court has entered judgment in which the cause of the eviction is established, such as by nonpayment of rent.  *See Philippeaux v. Apt. Inv. & Mgmt. Co.,* 598 F. App'x 640, 645 (11th Cir. 2015) (where plaintiff "claimed that he was evicted because he requested the accommodation," but "the record establishes that the state court eviction action was triggered by [plaintiff's] failure to pay rent," causal connection was not shown).  Because Plaintiff is unable to meet the elements of this claim against Anderson, Anderson is entitled to summary judgment on the FHA claim.

### IV.  EDGINGTON'S MOTION

---

[32] Again, Plaintiff continues to argue a number of extraneous points.  For instance, she continues to argue that the November 8, 2022 warrant was "void" under Ohio law.  She seems to attempt to insert new claims under § 1983. She also continues to reference that the maintenance man entered her home on November 8, 2022, but Plaintiff does not have claims against the maintenance man pending.

### A.      Motion for Summary Judgment

Edgington moves for summary judgment on the FHA claim that remains pending against him.  (Doc. 103.)  He argues that he did not engage in FHA retaliation, and to the extent applicable, argued he would be entitled to qualified immunity on any Fourth Amendment claim. For the reasons that follow, the Court will grant his Motion as to the former argument and need not address the latter.[33]

Once again, to prevail on her FHA retaliation claim, Chappel must prove: (1) that she exercised or enjoyed a right guaranteed by §§ 3603–3606 of the FHA; (2) that Edgington's intentional conduct constituted coercion, intimidation, threat, or interference; and (3) a causal connection between her exercise or enjoyment of a right and Edgington's conduct.  *Lawrence,* 784 F.Supp.3d at 1070.  Chappel must demonstrate "discriminatory animus" to prevail. *Kooman*, 833 F. App'x at 630–31.

As discussed with respect to the FHA claim against Anderson, Plaintiff's complaints filed to the Ohio Civil Rights Commission and to HUD fulfill the first prong.[34]  As to the second prong, Edgington asserts that he has not interfered with Plaintiff's housing rights in any way.  He did not evict her, and he did not coerce, intimidate, threaten or otherwise interfere with her housing rights.[35]  The Court agrees.  Plaintiff has not identified what adverse action Edgington engaged in to interfere with her exercise of her rights under the FHA.  Plaintiff also has not identified evidence that Edgington was aware Plaintiff filed complaints to the Ohio Civil Rights

---

[33] Again, Plaintiff attempts to argue claims under 42 U.S.C. § 1983 and 1985 as well as new allegations not pled in the Complaint involving an alleged traffic stop in 2024.  The same admonishment applies.

[34] Plaintiff attempts to argue that she disrespected Defendant Edgington's wife at some point in 2019 and that caused Edgington to taser her family's dog and attempt to have her family evicted with a prior landlord.  The same admonishment applies.  The Court limits its analysis to the complaints referenced above as to the first prong of its analysis.

[35] Plaintiff argues that Edgington providing civil standby in the home search pursuant to a court order was also retaliatory.  Because his attendance was pursuant to a Court order, and not in violation of her Fourth Amendment rights as she argues, this argument fails.

Commission or to HUD.[36]  As to the third prong, Chappel has not demonstrated a causal connection between her exercise of a right and Edgington's conduct.  As the Court found in analyzing the FHA claim against Anderson, Chappel's lease violations were the cause of her eviction, which forecloses causal connection being retaliatory.  A plaintiff is unable to establish retaliatory motive was the "but-for" cause of her eviction where a state court has entered judgment in which the cause of the eviction is established, such as by nonpayment of rent.  *See Philippeaux,* 598 F. App'x at 645 (causal connection was not shown).  For these reasons, the Court **GRANTS** summary judgment to Edgington on the FHA claim.

V.      **CONCLUSION**

For the reasons addressed within this Order, Moore's Motion for Judgment on the Pleadings (Doc. 85) is **DENIED**.  Moore's Motion for Summary Judgment (Doc. 102) is **GRANTED IN PART AND DENIED IN PART.**  Moore is entitled to qualified immunity on Chappel's § 1983 claims for Fourth Amendment right violations based upon the alleged improper search of her home, seizure of her children, and search of her body (drug testing).  Questions of fact preclude qualified immunity and summary judgment on Chappel's § 1983 claim based upon substantive and procedural due process violations of the Fourteenth Amendment based upon execution of the safety plan.  Lastly, Moore is entitled to summary judgment on Chappel's FHA retaliation claim.

Anderson's Motion to Dismiss (Doc. 100) is **DENIED**, but her Motion for Summary Judgment (Doc. 101) is **GRANTED**.  Edgington's Motion for Summary Judgment (Doc. 103) is **GRANTED.**

**Due to Plaintiff's repeated disregard of the Undersigned's Standing Order and the**

---

[36] Plaintiff speculated at her deposition that she believed Edgington made complaints to her former landlord.  She has not substantiated those allegations with any evidence.  (*See* Doc. 87 at PageID 1634–38.)

**Southern District of Ohio Local Rules, Plaintiff must obtain leave of court prior to filing any further documents in this case.  Additional disregard of these rules will result in sanctions and pleadings being stricken.**

      **IT IS SO ORDERED.**

                                   BY THE COURT:


                                   S/Susan J. Dlott
                                   Susan J. Dlott
                                   United States District Judge